# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.** |
| **JEFFERY D. SMITH d/b/a ATLANTA CAPITAL LLC a/d/b/a CAPITAL FUNDING, INC., JOSEPH CARSWELL d/b/a ATLANTA CAPITAL LLC a/d/b/a CAPITAL FUNDING, INC., and MICHAEL W. FULLARD,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Securities and Exchange Commission (the "Commission"), files its complaint and alleges that:

## SUMMARY

1.      In 2012 and 2013, Defendant Jeffery D. Smith ("Smith") and Joseph Carswell ("Carswell") defrauded at least four known investors out of at least a total of $775,000 using a variation of a prime bank scheme.

2.      Defendants Smith and Carswell used two fictitious companies to defraud investors: Atlantis Capital, LLC ("Atlantis Capital") and Capital Funding, LLC ("Capital Funding").  These companies do not appear to have ever been legally formed, and thus, were nothing more than "doing business as" entities.

3.      Smith and Carswell represented to victim investors orally and in documents that Smith could procure medium term notes, bank guarantees, and standby letters of credit worth millions of dollars for fees ranging between $100,000 and $250,000.

4.      Investors were told that those instruments would then be "monetized," that several million dollars of the monetized proceeds would be loaned to the investors in the form of non-recourse loans, and that Smith would invest the balance of the monetized proceeds in instruments such as debentures that would be traded in a manner that would produce returns of as much as 35% per week.  Those returns would be used to pay off the investors' loans.

5.      Investors were also assured by Smith and Carswell that the transactions were risk-free.

6.      Defendant Michael W. Fullard acted as a finder for Smith and Carswell.

2

7.     Fullard referred at least one victim investor to Smith and Carswell, recommended their services, and assisted with that victim's investment by forwarding executed documents from the victim to the escrow agent.  Bank documents show that, after investment proceeds came in, they were disbursed to Smith, Carswell, and Fullard (collectively, the "Defendants"), in some cases just hours after the investments were received.

8.     None of the investors received the rates of return promised by Smith and Carswell, and none has been successful in recovering more than a small portion of their investment proceeds from Smith or Carswell.

## VIOLATIONS

9.     Smith and Carswell engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and courses of business that constituted and will constitute violations of Sections 17(a)(1), (2) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1), (2) and (3)], as well as Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

10.    Smith, Carswell and Fullard engaged in, and, unless restrained and enjoined by this Court, will continue to engage in, acts, practices, schemes, and

3

courses of business that constituted and will constitute violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## JURISDICTION AND VENUE

11.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)], to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object, and for civil penalties and other equitable relief.

12.     The Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

13.     Defendants Smith, Carswell and Fullard, directly and indirectly, made use of the mails, the means and instruments of transportation or communication in interstate commerce, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint, and made use of the mails and means of instrumentality of interstate commerce to effect transactions, or to induce or to attempt to induce the purchase or sale of securities alleged in this Complaint.

4

14.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Northern District of Georgia.  The known investors were solicited in this district. In addition, some of the defrauded investors and Defendants Smith and Carswell reside in the Northern District of Georgia.

15.     As such, venue is proper under Section 22 of the Securities Act [15 U.S.C. § 77v] and under Section 27 of the Exchange Act [15 U.S.C. § 78aa].

16.     Defendants Smith, Carswell and Fullard, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this Complaint, and in transactions, acts, practices and courses of business of similar purport and object.

## THE DEFENDANTS

17.     **Jeffrey D. Smith**, age 35, resides in Lithonia, Georgia.  Smith does not appear to have ever held any professional licenses or been associated with a registered broker-dealer or investment adviser.

18.     **Joseph Carswell,** age 47, resides in Marietta, Georgia.  Carswell does not appear to have ever held any professional licenses or been associated with a registered broker-dealer or investment adviser.

19.     **Michael W. Fullard**, age 47, resides in Myrtle Beach, South Carolina.  Fullard does not appear to have ever held any professional licenses or to ever have been associated with a registered broker-dealer or investment adviser.

## RELATED ENTITIES

20.     **Atlanta Capital LLC** is the name that appears in many of the agreements signed by investors and related correspondence.  The Commission has found no other evidence of its legal existence.  As such, it appears to be an unregistered and unlicensed d/b/a of Smith and Carswell.

21.     **Capital Funding, Inc.**, also appears to be an unregistered and unlicensed d/b/a of Smith and Carswell.  Capital Funding, along with Atlanta Capital, appears in many of the documents and related correspondence utilized by Carswell and Smith with investors.  The Commission has found no other evidence of its legal existence, and thus, it also appears to be an unregistered and unlicensed d/b/a of Smith and Carswell.

## DEFENDANTS' PRIME BANK SCHEME

### A.     Investor Entity 1

22.     In 2012, a Managing Director of a Hong Kong-based energy company ("Investor Entity 1") was seeking capital for energy-related investments.  An

6

acquaintance referred the Managing Director to Fullard, who informed him that Fullard regularly used bank guarantees to raise capital.

23.     Fullard introduced the Managing Director of Investor Entity 1 to Smith, who represented that Smith and Atlanta Capital could arrange for Investor Entity 1 to "lease" a $10 million bank guarantee for $150,000.  Smith further represented that once the leased bank guarantee was "monetized," $3.5 million would be given to Investor Entity 1 in the form of a non-recourse loan.

24.     Smith represented that he would then, after deducting his 1% – 2 % fee, invest and trade the remaining approximately $6.3 million on private trading platforms – generating enough profit to pay off Investor Entity 1's non-recourse loan.

25.     Smith also told the Managing Director that such deals were "rock solid" and that nothing could go wrong, in part, because the loan was non-recourse and, in part, because Investor Entity 1 would have the bank guarantee that was worth $10 million in its possession as soon as it paid the leasing fee.

26.     Among the documents involved in the transaction was a "Letter of Commitment" on Atlanta Capital letterhead stating that Investor Entity 1 had submitted an application "for the purpose of securing an SBLC [standby letter of credit] in the amount of $10,000,000.00 ("Instrument") from the National

Westminster Bank in the UK (NatWest), or other bank mutually agreed upon by the parties, for business related activities."

27.     The terms of the "Letter of Commitment" document required Investor Entity 1 to escrow funds with Atlanta Capital in order to secure the investment. The document also represented that Atlanta Capital had the ability to arrange such an "instrument." When Investor Entity 1 agreed to proceed, emails written by Fullard indicate that he prepared a document entitled "escrow agreement."

28.     On December 10, 2012, the Managing Director of Investor Entity 1 wired $150,000 to an escrow account designated by Smith and waited for the bank guarantee to be deposited in Investor Entity 1's account. Approximately one week later, Smith informed the Managing Director that Smith had obtained the bank guarantee and had confirmed that it was legitimate.

29.     Smith subsequently sent the Managing Director of Investor Entity 1 a document purportedly showing that a bank guarantee issued by National Westminster Bank for $10 million would be transferred to Investor Entity 1's account as soon as Investor Entity 1 instructed the escrow agent to release the funds necessary to lease it.

30.     On December 19, 2012, Fullard emailed an executed authorization to release Investor Entity 1's funds from escrow to Carswell. Fullard then served as

8

the contact person for Investor Entity 1 during the purported "monetization" process.

31.     Investor Entity 1, however, never received the promised funds.

32.     In an effort to uncover why Investor Entity 1 had not received the promised funds, the Managing Director contacted Carswell because Carswell had been copied on an email regarding the escrowed funds.  Carswell assured the Managing Director that although he knew nothing about this particular transaction, he had dealt with Smith for years and knew that Smith had a good track record of successfully completing such transactions.

33.     Carswell, who promised to help the Managing Director of Investor Entity 1 recover its principal, convinced the Managing Director that Investor Entity 1 could do so by leasing a $2 million certificate of deposit ("CD") from a "top American bank."  Carswell represented that the leased CD would generate a non-recourse loan sufficient to cover Investor Entity 1's losses, and that the loan would be paid off by the trading of the CD in a market similar to the one described by Smith.

34.     Carswell told the Managing Director, however, that in order to participate in this transaction, Investor Entity 1 would have to escrow another $32,000.  Carswell arranged for the Managing Director of Investor Entity 1 to

receive the appropriate documents.  Investor Entity 1 then escrowed the additional

$32,000, but never received the non-recourse loan and, to date, has only received

$10,000 of its principal from Carswell despite repeated efforts to collect.

35.     The escrow agent's records indicate that on December 19, 2012,

$12,000 of Investor Entity 1's escrowed funds were disbursed to Fullard, $112,000

were disbursed to Smith and $12,000 were disbursed to Carswell.

### B.     Investor Entity 2

36.     In 2013, the CEO and the two managing partners of a Florida-based

real property company ("Investor Entity 2") were seeking financing for the

acquisition of a coal mine in Pennsylvania.

37.     The CEO was told by a business associate that the acquisition could

be financed using standby letters of credit.  When one of the managing partners

expressed an interest in learning more about the process that had been described to

him by the CEO, the CEO's business associate arranged for representatives of

Investor Entity 2 to meet Smith and Carswell.

38.     On or around April 3, 2013, the CEO and one of the managing

partners attended a meeting with Smith in Atlanta, Georgia.  The other managing

partner participated in the meeting by telephone.  During that meeting, Smith

stated that, following the investment by Investor Entity 2, Atlanta Capital would

obtain a "fresh cut" or "slightly seasoned" standby letter of credit that would be monetized for $10 million, that 60% of the proceeds of the monetization would go to Investor Entity 2 in the form of a non-recourse loan, and that the remainder of the proceeds would be traded on "private placement platforms."

39.     Smith represented that trading the monetized proceeds that were not loaned to Investor Entity 2 would generate 35% profit each week and would be used to repay Investor Entity 2's non-recourse loan.  Documents given to Investor Entity 2 describing the process state that either a medium term note or a standby letter of credit could be used to generate that capital.  At various times, Smith stated that the principal was "100% safe" and could not be lost because it was "impossible to lose" any money.

40.     The documents involved in the transaction included one entitled "Letter of Commitment" on Atlanta Capital letterhead that stated Investor Entity 2 had submitted an application "for the purpose of securing an MTN [medium term note] or SBLC/BG [standby letter of credit/bank guarantee] in the amount of $10,000,000.00 ("Instrument") from the top World European Banks for business related activities."  That document also stated that Atlanta Capital had the ability to arrange such an instrument.

11

41.     On April 5, 2013, Investor Entity 2, having received and executed the required documents from Smith and Carswell, deposited $150,000 to obtain the financing described by Smith with the escrow agent designated by Smith.

42.     After Investor Entity 2 authorized the release of funds from escrow so that they could be used to acquire the standby letter of credit, the escrow agent's records indicate that on April 18, 2013, $5,000 was disbursed to Fullard, $12,500 was disbursed to Carswell, and $71,500 was disbursed to Smith.  On April 26, 2013, an additional $12,000 was disbursed to Carswell, $12,000 was disbursed to Smith, and $6,000 was disbursed to Fullard.

43.     Investor Entity 2 has never received the non-recourse loan and has only managed to recover approximately $52,000 of its principal.

### C.    Individual Investor 1

44.     In 2013, a man residing in Buford, Georgia ("Individual Investor 1), who was raising capital to fund religious and other non-profit activities, was introduced to Carswell by an associate.  Carswell told Individual Investor 1 that Carswell was an ordained minister and that he and Smith could help Individual Investor raise capital.

45.     Carswell represented that, if Individual Investor 1 escrowed $200,000, the funds would be used to lease a standby letter of credit or bank guarantee valued

at $10 million. The leased instrument would then be "monetized" for $8 million, of which $7.2 million would be loaned to Individual Investor 1 within 45 days in the form of a non-recourse loan. The remaining $800,000 would be traded by Smith.

46. Carswell also explained that Smith would invest that $800,000 in debentures that would be traded on a daily basis, and that the profit from those trades would be used to repay the $7.2 million loaned to Individual Investor 1. Carswell, who was at this point plainly aware of Smith's nonperformance with respect to Investor Entity 1, assured Individual Investor 1 that he knew Smith, had worked with him on similar transactions before, and that Smith always "performed" and always "pays."

47. Carswell also personally guaranteed that the transaction would work as he had described, and repeatedly said that there was "no risk." During their initial meeting, which took place in Buford, Georgia, Carswell called Smith and let Individual Investor 1 talk to him. Smith repeated much of Carswell's description of the capital raising process and stated repeatedly that there was "no risk" associated with it.

48. Among the documents involved in the transaction was one entitled "Capital Funding Letter of Commitment," on the letterhead of Capital Funding,

13

stating that Individual Investor would submit an application "for the purpose of securing an MTN or SBLC/BG in the amount of $10,000,000.00 ("Instrument") from the top World European Banks for business related activities.  This document states that "Capital Funding has the ability to arrange such INSTRUMENT . . . ."

49.     Carswell subsequently informed Individual Investor 1 that Smith had leased a standby letter of credit for someone else with a face value of $100 million – ten times the value of the instrument that Individual Investor 1 was considering leasing.  Carswell told Individual Investor 1 that if he quickly escrowed $200,000, it could be used to lease a portion of that instrument.  Moreover, because of the size of that instrument, the $7.2 million to be loaned to Individual Investor 1 would be available in less than 45 days.

50.     Individual Investor 1 escrowed $200,000 on July 12, 2013, and simultaneously authorized its release so that the "instrument," (i.e., the medium term note, standby letter of credit, or bank guarantee) could be obtained.  Smith then informed Individual Investor 1 that the funds had been released to Smith and that everything was proceeding as planned.

51.     Individual Investor 1 never received the funding that he was promised.  Despite persistent inquiries, Individual Investor 1 only managed to recover $17,500 of the $200,000 that he invested.

14

52.     The escrow agent's records indicate that on July 12, 2013, $134,000 of the funds escrowed by Individual Investor 1 was disbursed to Smith and $25,000 was disbursed to Carswell.  Another $35,000 was disbursed to Carswell on July 15, 2013.

### D.     <u>Individual Investor 2</u>

53.     In 2012, a Mexican national ("Individual Investor 2") invested approximately $250,000 with Atlanta Capital.

54.     The documents involved in the transaction included a "Letter of Commitment" on Atlanta Capital letterhead that stated Individual Investor 2 had submitted an application "for the purpose of securing an MTN or SBLC in the amount of $20,000,000.00 ("Instrument") from the top World European Banks for business related activities."

55.     The document also stated that Atlanta Capital had the ability to arrange such an instrument.

56.     On July 25, 2012, Individual Investor 2 deposited $249,970 in escrow with an escrow agent known to work with Smith and Carswell.

57.     The escrow agent's records indicate that, after the funds were deposited into escrow, $115,000 was disbursed to Carswell between July 30, 2012

and August 15, and another $45,000 was disbursed to Smith in the same time frame.

## COUNT I – FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

### (Defendants Smith and Carswell)

58.     Paragraphs 1 through 56 are hereby re-alleged and incorporated herein by reference.

59.     During 2013 and 2014, Defendants Smith and Carswell, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

60.     Defendants Smith and Carswell knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

61.     While engaging in the course of conduct described above, Defendants Smith and Carswell acted with scienter, that is, with an intent to deceive, manipulate, or defraud, or with a severely reckless disregard for the truth.

16

62.   By reason of the foregoing, Defendants Smith and Carswell, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II – FRAUD

**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**

**(Defendants Smith and Carswell)**

63.   Paragraphs 1 through 56 are hereby re-alleged and incorporated herein by reference.

64.   From at least March 2013 through September 2015, Defendants Smith and Carswell, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a. obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

17

    b.  engaged in transactions, practices and courses of business which

        would and did operate as a fraud and deceit upon the purchasers of

        such securities, all as more particularly described above.

65.    By reason of the foregoing, Defendants Smith and Carswell, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c) Thereunder**
**[15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a), (b) and (c)]**

**(Defendants Smith and Carswell)**

66.    Paragraphs 1 through 56 are hereby re-alleged and incorporated herein by reference.

67.    During 2013 and 2014, Defendants Smith and Carswell, in connection with the purchase or sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:

    a.  employed devices, schemes, and artifices to defraud;

b.  made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.  engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

68.  Defendants Smith and Carswell knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes, and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices, and courses of business.  In engaging in such conduct, Defendants Smith and Carswell acted with scienter; that is, with an intent to deceive, manipulate, or defraud or with a severely reckless disregard for the truth.

69.  By reason of the foregoing, Defendants Smith and Carswell, directly and indirectly, have violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT IV – FAILURE TO REGISTER AS SECURITIES BROKER

**Violations of Section 15(a) of the Exchange Act**
**[15 U.S.C. § 78o(a)**

**(All Defendants)**

70.     Paragraphs 1 through 56 are hereby re-alleged and incorporated herein by reference.

71.     By their conduct as alleged above, during 2013 and 2014, Defendants violated Section 15(a)(1) of the Exchange Act, which makes it unlawful for a broker "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker . . . is registered" with the Commission pursuant to Section 15(b) of the Exchange Act or, in the case of a natural person, is associated with a registered broker-dealer.

72.     During 2013 and 2014, as alleged above, Defendants Smith, Carswell and Fullard participated in the sale of over $750,000 of securities to multiple investors.

73.     Defendants, during that time, actively solicited investors, handled customer funds and securities, and gave advice as to the merits of the investments they offered.

74.     During 2013 and 2014, none of the Defendants were registered with the Commission as a broker pursuant to Section 15(b) of the Exchange Act, nor were any of them associated with a registered broker-dealer.

75.     By reason of the foregoing, Defendants have violated and, unless enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] by acting as unregistered brokers.

WHEREFORE, Plaintiff Commission respectfully prays for:

## I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendants committed the violations alleged herein.

## II.

Permanent injunctions enjoining Defendants Smith and Carswell, their officers, directors, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)].

**III.**

Permanent injunctions enjoining Defendants, their officers, directors, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**IV.**

An order requiring the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

**V.**

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] imposing civil penalties against all Defendants.

**VII.**

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the

Commission demands trial by jury in this action of all issues so triable.

Dated this 8th day of November, 2016.

Respectfully submitted,

/s/ *W. Shawn Murnahan*
W. Shawn Murnahan
Senior Trial Counsel
Georgia Bar No. 529940
Tel: (404) 842-7669
Email: murnahanw@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Tel: (404) 842-7622
Email: loomism@sec.gov

COUNSEL FOR PLAINTIFF
Securities and Exchange Commission
Atlanta Regional Office
950 East Paces Ferry Road, N.E., Suite 900
Atlanta, GA  30326-1382
Fax: (703) 813-9364